CHESTER TOWNSHIP, APPELLANT, *v.* POWER SITING COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as Chester Twp. v. Power Siting Comm. (1977), 49 Ohio St 2d 231.]

(No. 76-801—Decided March 16, 1977.)

232

Mr. *Alan Miles Ruben*, for appellant.

Mr. *William J. Brown*, attorney general, and Mr. *David E. Northrop*, for appellee Power Siting Commission.

*Messrs. Guren, Merritt, Sogg & Cohen, Mr. Michael L. Hardy, Mr. James M. Friedman* and *Mr. Donald H. Hauser,* for intervenor-appellee Cleveland Electric Illuminating Co.

WILLIAM B. BROWN, J. The issues raised by this cause are (1) whether, under R. C. Chapter 4906, the Power Siting Commission must normally defer to local judgment about power line tower designs, (2) whether the testimony of electrical engineers about the effect of electromagnetic fields on nearby animal and plant life constitutes competent expert witness testimony on which the commission may base its determination, and (3) what is the appropriate standard of review by this court of a Power Siting Commission determination.

Chester Township poses two basic arguments to this court. The first is that Ohio townships are "vested with the primary responsibility for regulating the size and design of new structures * * * within their jurisdictions" and, therefore, that the Power Siting Commission should defer to local judgment on tower designs unless the state can show that such deference "will conflict with an overriding state interest, place an unreasonable burden upon the applicant public utility or otherwise interfere with the ability of the public utility to carry out the project for which it seeks certification." The second basic argument is that "[t]he testimony of expert witnesses" about the effect of electro-magnetic fields on plant and animal life "does not constitute substantial competent evidence upon which the commission may base its determination."[1]

Appellant's first argument is without merit. It is true

[1] In the reply brief which it submitted before this court, Chester Township raises, in addition to the two issues cited above, the question of whether the "record evidence" upon which the commission bases its decision, pursuant to R. C. Chapter 4906, is limited to evidence found only in the "transcript of the adjudicatory hearings conducted by the administrative law judge," or whether it includes information from the application and the secretary's staff report as well. Under R. C. 4906.12 most provisions of R. C. Chapter 4903 (including R. C. 4903.10) apply to proceedings conducted pursuant to R. C. Chapter 4906. R. C. 4903.10 provides in pertinent part:

that R. C. 519.02 grants township trustees the power to "regulate by resolution the location, height, bulk, number of stories, and size of buildings and other structures * * * in the unincorporated territory of such township * * *." Appellant cannot, however, rely on R. C. Chapter 519 to argue that the Power Siting Commission must normally defer to local judgment, in view of the fact that R. C. 519.21 *exempts* from the local zoning control of R. C. 519.02 "any buildings or structures of any public utility * * * or the use of land by any public utility * * * for the operation of its business."[2]

---

"After any order has been made * * * any party who has entered an appearance in person or by counsel in the proceeding may apply for a rehearing in respect to any matters determined in said proceeding.

"* * *

"Such application shall be in writing and shall set forth specifically the ground or grounds on which the applicant considers said order to be unreasonable or unlawful. No party shall in any court urge or rely on any ground for reversal, vacation, or modification not so set forth in such application."

Appellant's application for a rehearing was based on the argument that the expert witnesses relied on by the commission should not have been given credence because both were electrical engineers and, as such, they were "incompetent to render an opinion on the health hazards posed by high voltage transmission lines." To support that contention appellant asserts:

"* * * And, the commission cannot remedy the deficiency by standing upon the tentative, incomplete and unsupported statements contained in the application * * * or upon the untested data submitted by the staff."

Appellant's passing reference to information in the application or secretary's report, made in support of an *evidentiary* argument, is insufficient to constitute grounds for a last-minute *statutory* challenge to the inclusion of that information in the record. In *Agin* v. *Pub. Util. Comm.* (1967), 12 Ohio St. 2d 97, 98, this court stated:

"There is some similarity between parts of some of the grounds stated in appellants' application for rehearing before the commission and parts of some of the statements of law in appellants' brief on appeal in this court. Such a casual similarity does not, however, meet the requirements of Section 4903.10, Revised Code * * *."

The same principle applies to the instant cause.

[2]R. C. 519.21 provides that Sections 519.02 to 519.25, inclusive, of the Revised Code, "confer no power on any board of township trustees

For similar reasons, the provisions of R. C. Chapter 4906 do not support the township's contention that the commission must normally defer to local judgment on tower designs. Although R. C. Chapter 4906 predicates the grant of an application to construct public utility facilities upon a commission finding that "the facility will serve the public interest, convenience and necessity," and although it provides local governments with notice of the utility company's application and makes them parties to the certification hearing, the Revised Code Chapter does not make local judgment *control* the commission's choice of tower designs.[3] On the contrary, R. C. 4906.10(A) requires that the commission base its decision to grant or deny an application on "the record." Furthermore, R. C. 4906.13 and 4906.02(A) make it clear that approval of public utility construction plans, including the selection of tower designs, is a *state* matter. R. C. 4906.02(A) grants the commission

---

or board of zoning appeals in respect to the location, erection, construction, reconstruction, change, alteration, maintenance, removal, use, or enlargement of any buildings or structures of any public utility or railroad, whether publicly or privately owned, or the use of land by any public utility or railroad, for the operation of its business."

[3]R. C. 4906.10(A) requires the commission to "render a decision upon the record" granting or denying an application, only after it finds and determines:

"(1) The basis of the need for the facility;

"(2) The nature of the probable environmental impact;

"(3) That the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations;

"(4) In case of an electric transmission line, that such facility is consistent with regional plans for expansion of the electric power grid of the electric systems serving this state and interconnected utility systems; and that such facilities will serve the interests of electric system economy and reliability;

"(5) That the facility will comply with Chapters 3704, 3734, and 6111 of the Revised Code and all regulations and standards adopted thereunder;

"(6) That the facility will serve the public interest, convenience, and necessity."

R. C. 4906.06(A) requires that "[a]n applicant for a certificate

236

statewide jurisdiction and requires that four of its five members be drawn from existing state agencies. R. C. 4906.-13 provides, in pertinent part:

"No public agency or political subdivision of this state may require any approval, consent, permit, certificate or other condition for the construction or initial operation of a major utility facility authorized by a certificate issued pursuant to Chapter 4906 of the Revised Code. * * *"

Given the fact that R. C. 4906.13 expressly prohibits local governments from conditioning the construction or operation of R. C. Chapter 4906 public utility facilities on local "approval" and given the fact that R. C. 4906.06(B) and 4906.08(A)(2) provide for investigating the claims and hearing the testimony of townships *and* applicants, we find appellant's argument that township preferences as to tower designs should normally control to be without merit.[4]

Chester Township argues further that the commission erred in basing its determination that the electro-magnetic fields surrounding power lines would not be detrimental to the public on the testimony of two electrical engineers

shall file with the Power Siting Commission an application * * *."

R. C. 4906.06(B) provides:

"Each application shall be accompanied by proof of service of a copy of such application on the chief executive officer of each municipal corporation and county and the head of each public agency, charged with the duty of protecting the environment or of planning land use, in the area in which any portion of such facility is to be located."

[4]The dissent argues in effect: (1) that tower designs are a question of aesthetics, (2) that aesthetic questions are capable only of subjective responses, and (3) that local governing boards should decide which tower designs are aesthetically pleasing since they have to live with them. The fact is, however, that R. C. Chapter 4906 requires the commission to rule on the "environmental impact" of such proposed public utility constructions as power line towers. That the analysis of the "environmental impact" of a tower necessarily involves a judgment as to its aesthetic appeal does not change the thrust of the statute. The question of aesthetics, like those of "need," consistency with regional expansion plans and "public interest, convenience and necessity" must be resolved by the *commission* (R. C. 4906.10) and not by one of the parties.

because such opinion testimony was "outside" the engineers' "field, experience or discipline." We do not find this argument convincing. The finder of fact has the power to make reasonable rulings as to the competency, admissibility and scope of expert testimony and to determine the weight to be accorded that testimony. *Railroad Co. v. Defiance* (1895), 52 Ohio St. 262, paragraph nine of the syllabus; McCormick on Evidence (2 Ed.) 29, Section 13; 21 Ohio Jurisprudence 2d 425, Evidence, Section 416. This rule is especially applicable to an R. C. Chapter 4906 proceeding because the General Assembly has granted the commission discretion, in its fact-finding role, to require such information, conduct such studies and adopt such rules of evidence as it deems necessary. R. C. 4906.10, 4906.03, and 4906.09.[5] The engineers were called to testify in order to rebut the statements of another electrical engineer, and much of their testimony involved comparing the electro-magnetic fields which would surround the proposed line with those which had surrounded the power lines studied in reports submitted as exhibits by appellant. Given the context in which the expert opinions concerning the danger of the electromagnetic fields were elicited, this court does not find that the commission abused its discretion in admitting and

[5]Under R. C. 4906.03, the commission shall:

"(C) Require such information from persons subject to its jurisdiction as it considers necessary to assist in the conduct of hearings and any investigations or studies it may undertake;

"(D) Conduct any studies or investigations which it considers necessary or appropriate to carry out its responsibilities under this chapter;

"(E) Adopt rules establishing criteria for evaluating the effects on environmental values of proposed and alternative sites, and projected needs for electric power, and such other rules as are necessary and convenient to implement Chapter 4906 of the Revised Code, including reasonable application fees."

R. C. 4906.09 provides:

"A record shall be made of the hearing and of all testimony taken. Rules of evidence, as specified by the Power Siting Commission, shall apply to the proceeding. The commission may provide for the consolidation of the representation of parties having similar interests."

weighing their testimony. Appellant's second argument is not well taken.

Implicit in appellant's arguments concerning expert opinion testimony about electro-magnetic field effects and the deference to be given to local judgment about tower design, is a challenge to the commission's determination on the grounds that it is against the weight of the evidence. Pursuant to R. C. 4906.12, this court must apply the same standard of review to Power Siting Commission determinations as we apply to orders by the Public Utilities Commission.

R. C. 4906.12 states:

"Sections 4903.02 to 4903.16 and Sections 4903.20 to 4903.23 of the Revised Code shall apply to any proceeding or order of the Power Siting Commission under Chapter 4906 of the Revised Code, in the same manner as if the commission were the Public Utilities Commission under such sections."

R. C. 4903.13 provides:

"A final order made by the Public Utilities Commission shall be reversed, vacated, or modified by the Supreme Court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable."

Under the "unlawful or unreasonable" standard of R. C. 4903.13, this court will not reverse or modify a determination unless it is manifestly against the weight of the evidence and so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Delphos* v. *Pub. Util. Comm.* (1940), 137 Ohio St. 422, 424; *Cleveland Electric Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403, paragraph eight of the syllabus; and *General Motors Corp.* v. *Pub. Util. Comm.* (1976), 47 Ohio St. 2d 58, paragraph two of the syllabus.

The commission's findings that towers of lattice construction are preferable to those of pole construction chosen by the township trustees and that the electro-magnetic fields surrounding the towers will not be detrimental to nearby

animal and plant life are not manifestly against the weight of the evidence. At the hearing, the commission was presented with substantial evidence that lattice towers are appropriate for the Chester Township area. Witnesses testified that the lattice design is well suited to the predominantly wooded landscape of Chester Township, that it is compatible with towers already built on the right of way which the proposed line will share, and that the lattice design costs 80 percent less than the tower design proposed by the trustees. The commission was also presented with sufficient information indicating that the electro-magnetic fields surrounding the proposed tower lines will not be detrimental. The secretary's report came to that conclusion. Witnesses at the hearing concurred with the secretary's report, and appellant's evidence to the contrary was placed in doubt by the testimony of experts as to the voltage of the proposed power lines. In light of the considerable evidence in the record supporting the commission's findings, we hold its determinations to be reasonable and lawful. The order of the Power Siting Commission is affirmed.

*Order affirmed.*

O'NEILL, C. J., HERBERT, CELEBREZZE, P. BROWN and SWEENEY, JJ., concur.

LOCHER, J., dissenting. Today, it is evident that overhead high voltage transmission lines are a fact of life in a world in which the demands for electric power are constantly growing. Furthermore, it is presently accepted that there is no known way to produce, transmit and distribute electric energy without some effect on the environment. Indeed, it is ironic that, just at the time when a portion of our society has become concerned with the environment and aesthetic questions, this country is saddled with an insatiable appetite which consumes ever increasing amounts of electricity and all other known forms of energy. The

result is a conflict between the needs of a highly technological society and an increased awareness of environmental considerations.

A realization of this conflict served as an impetus to the General Assembly's establishment of the Power Siting Commission (hereinafter "commission"). In general, the commission is responsible for evaluating the effects on the environment of proposed and alternative sites for the location of power plants and transmission line routes. 43A Ohio Jurisprudence 2d, Pollution Control, Section 155. R. C. 4906.04 states that no person shall commence to construct a major utility facility in Ohio without first having obtained a certificate for the facility from the commission. Guidelines for the issuance of the certificate are established by R. C. 4906.10. In relevant part, they require the commission to find:

(1) The basis for the need for the facility;

(2) the nature of probable environmental impact;

(3) that the facility represents the *minimum adverse environmental impact*, considering the state of available technology and the nature and the economics of various alternatives, and *other pertinent considerations*; and

(4) that the facility will serve the *public interest*, convenience and necessity.

Furthermore, R. C. 4906.13 prevents public agencies and political subdivisions from requiring approval, consent, permit, certificate or other condition for construction or initial operation of a major utility facility. Plainly speaking, the object of the statute is to prevent local authorities from placing "local" considerations ahead of "statewide" concerns. Clearly, the General Assembly created the commission to balance the presently competing interest of energy and environment, endowed it with the necessary power to prevent local concerns from interfering with statewide energy needs, and then formulated the guidelines within which the commission is to perform its task. To this court was given the duty of ascertaining the commission's adherence to these principles.

Today's affirmance of the commission's order grants the approval of this court to a standard that, when applied, rejects, for apparently aesthetic reasons only, the judgment of the duly elected representatives of a community concerning the nature of transmission towers to be placed within their community and accepts the design proposed by the utility and its hired consultant, regardless of the failure to show that the design chosen by the community is unreasonable, conflicts with an overriding state interest, or impairs the ability of the utility to complete the project for which it seeks certification. While I concur with the majority's statement that this court must apply the same standard of review to the commission's determination as it applies to the orders of the Public Utilities Commission, I disagree with its conclusion that the commission's findings were supported by considerable evidence and the determinations based thereon were reasonable and lawful.

The facts reveal the commission's acceptance of the recommendation of the utility and its consultant to use horizontal lattice design transmission towers along that segment of the route passing through Chester Township, despite the fact that the Board of Trustees of Chester Township approved the "H" frame steel pole design as being compatible with the community and its future development. In finding the commission's order reasonable and lawful, the majority points to the following evidence:

(1) the "lattice" design is well suited to the predominantly wooded landscape of Chester Township;

(2) the "lattice" design towers are compatible with the existing towers on the right-of-way; and

(3) the "lattice" design towers cost 80 percent less than the design approved by the trustees.

In addressing the last point first, the record is inundated with comments by the representatives of the utility implying that cost was not a controlling factor in the selection of the "lattice" type tower for use on the route through Chester Township. In fact, counsel for appellee reiterated the same proposition in oral argument before this court.

242

The utility presented various viable tower designs for use along the route from which Chester Township chose their design which incidentally was not the most expensive of the designs submitted. The commission made no finding of the exact total dollar increase that would result with the use of the "H" frame tower for that portion of the route traversing Chester Township. Nor did the commission relate this increased cost as a percentage to the total cost of the project, or its ultimate relationship to utility rates. Generally, the cost problem presented by the variance in cost between transmission tower designs is minimal in relationship to the overall cost of the project.[6] Therefore, it appears unreasonable for the commission to base its decision on a factor which the utility has frequently admitted played no relevant part in its decision to use the "lattice" type structure.

The argument that the "lattice" design towers are compatible with the existing transmission towers is hardly more compelling. Evidence obtained during the hearings showed that the existing towers were constructed in the 1930's. Even if aesthetics were considered when these existing towers were constructed, it is reasonable to assume that their environs have changed during the past 45 years. The commission is thus basing its order on the proposition that what was good in 1930 must continue to be appropriate for 1976.

Furthermore, evidence was presented and a finding made by the administrative law judge that transmission towers had a useful life of 75 years. In this regard, Chester Township expressed its desire that the existing towers

[6]"The aesthetics issue has, however, on occasion arisen in another and more diffuse form when it is contended, not that the transmission lines should be placed underground, but that they should be supported by some type of structure different from that proposed, allegedly more aesthetic. Generally speaking, here the cost problem becomes less acute and we are confronted with a simple comparison of the attractiveness of one type of a structure as opposed to another. * * *" Buchmann, Electric Transmission Lines and the Environmment (1972), 21 Cleveland State L. Rev. (2), 121, 133.

would at the expiration of their useful life be replaced by a tower of a design more compatible with the community. The commission's order would merely perpetuate the use of a tower similar to existing towers for the mere sake of symmetry. Application of this tenet places a developing community in the position of forever being saddled with transmission towers similar to those already existing within the community. Thus, the community is left to place the blame on their nearsighted forefathers.

The only remaining evidence from which the commission could reasonably conclude the "lattice" design tower is preferable to the "H" steel pole design was the testimony of the utility representatives as to the findings of their consultants that the lattice design is well suited to the predominantly wooded landscape of Chester Township. Thus, the decision of the commission appears to be based not on the energy needs of the state, economics, or technological considerations but upon aesthetics, beauty versus ugliness, or likes versus dislikes. The commission accepted the "taste" of the utility and its consultants in spite of the request of the duly elected representatives of Chester Township to use a tower which they believe to be more compatible with their community and their plans for their future. It will not be the utility, its consultants, the commission or the vast majority of the populace of Ohio, but the residents of Chester Township who will awake each morning to find the "erector-set" images superimposed on their vision of the horizon. Beauty and ugliness or likes and dislikes are purely subjective. The requirement of probative evidence as to the effect on the residents and the community is both impractical and unrealistic. The residents of Chester Township will bear the imposition; it is only logical that, if this necessary intrusion could be slightly lessened by taking a different form, fulfillment of a minimum adverse environmental impact should be the commission's objective.

Chester Township's choice of the "H" design tower instead of the "lattice" design transmission tower in no

244

manner impedes or restricts the transmission of needed electricity. This is not the classic example of the conflict between energy and the environment. The transmission lines will traverse the township. The township's request only goes to the nature of the beast, not to its existence. The township's request would present no technical obstructions to the completion of the project. R. C. 4906.10 requires the commission to determine the facilities that represent the minimum adverse impact. It is the opinion of the representatives of the community that the use of the "H" design tower would minimize the adversity of this necessary creature of our modern world. Thoughtful consideration of and due respect to an affected community's opinion expressed by its legal representatives by the commission is implied from the notice provision of R. C. 4906.06(B). However, thoughtful consideration and due respect are certainly not implied by the statement the commission used in disposing of the township's request:

"Simply stated, there is a lack of evidence to justify the use of steel pole, H-frame structures in Chester Township."

I believe it is unreasonable to infer a legislative intent that the commission, in circumstances as these and where no matter of statewide concern is presented, is presumed to be able to tell the inhabitants of a community what they will like or dislike.