[Cite as *In re Application of Buckeye Wind, L.L.C.,* 131 Ohio St.3d 449, 2012-Ohio-878.]

IN RE APPLICATION OF BUCKEYE WIND, L.L.C., FOR A CERTIFICATE TO
CONSTRUCT WIND-POWERED ELECTRIC GENERATION FACILITIES IN
CHAMPAIGN COUNTY, OHIO; UNION NEIGHBORS UNITED ET AL., APPELLANTS;
POWER SITING BOARD ET AL., APPELLEES.

[Cite as *In re Application of Buckeye Wind, L.L.C.,*
131 Ohio St.3d 449, 2012-Ohio-878.]

*Power Siting Board—Wind-powered electric generation facility—Determination
approving siting of facility was lawful, reasonable, and not manifestly
against the weight of the evidence—Board did not improperly delegate its
decisionmaking authority to staff.*

(No. 2010-1554—Submitted September 21, 2011—Decided March 6, 2012.)

APPEAL from the Power Siting Board, No. 08-666-EL-BGN.

_____

LANZINGER, J.

{¶ 1} This is the first time that we have reviewed an order involving the grant of authority to construct a proposed wind-powered electric generation facility. After full review of the record and consideration of the parties' arguments, we hold that the order of the Power Siting Board should be affirmed because the board acted in accordance with all pertinent statutes and regulations.

## I. Background

{¶ 2} The General Assembly enacted legislation, 2007 Am.Sub.S.B. No. 221, effective July 31, 2008, to require utilities to provide a portion of their electricity supply from alternative energy sources by 2025. *See* R.C. 4928.64 and 4928.65. The term "alternative energy resource" includes a "renewable energy resource." R.C. 4928.64(A)(1). Wind energy is listed within the definition of "renewable energy resource." R.C. 4928.01(A)(35). Under R.C. 4906.03, the

board has been granted exclusive authority to issue certificates for construction, operation, and maintenance of major utility facilities.

{¶ 3} A private developer, Buckeye Wind, L.L.C. ("Buckeye"), developed a plan to build 70 wind turbines over approximately 9,000 acres in Champaign County, Ohio, where Buckeye perceived a favorable blend of wind, open land, and access to the electric power grid. This project is one of the first wind farms in Ohio. The wind farm's expected generation capacity exceeded 126 megawatts, qualifying it under R.C. 4906.01(B)(1) as a "major utility facility" that required the approval of the board. R.C. 4906.03.

{¶ 4} In April 2009, Buckeye filed with the board a 1,500-page application for a certificate of environmental compatibility and public need. *See* R.C. 4906.04. A group of neighboring landowners, Union Neighbors United ("UNU"), Robert and Diane McConnell, and Julia Johnson (collectively, "the neighbors"), opposed the application. Several other entities, including Champaign County and several local townships (collectively, "the county"), also intervened.

{¶ 5} The neighbors were concerned about noise and the turbines' proposed setbacks of 914 feet from homes and 541 feet from property lines. Wind turbines such as those proposed by Buckeye can stand as tall as 328 feet, with a blade at the highest point being 492 feet high. The neighbors also raised issues of "shadow flicker," a potentially annoying phenomenon caused by the swinging of turbine blades between the ground and the sun, and the possibility of blade detachment. Unlike landowner-lessors who host turbines, the neighbors received no compensation from Buckeye, and they also noted the effect the proposed facility could have on property values. The board rejected most of the neighbors' requests and approved construction of most of the proposed turbines.

{¶ 6} The county did not oppose the siting of the turbines but sought financial protection through bond requirements that would ensure that adequate

money was available to (1) repair any roads damaged by the project and (2) remove (or "decommission") the turbines if and when they became inoperable. The board agreed to require a $5,000 bond for the first year of operation. The county was dissatisfied with the bond amount as well as the fact that the Champaign County Engineer did not have final say on the amount.

{¶ 7}   The county appealed, as did the neighbors. Buckeye intervened on behalf of the board. The county raised three propositions of law, the neighbors raised ten propositions of law, and the Ohio Farm Bureau filed an amicus brief urging affirmance.

## II.  Legal Analysis

### A.  The Board Conducted Appropriate Public Hearings

{¶ 8}   In their ninth proposition of law, the neighbors argue that the board deprived the neighbors of "the statutory right to call and examine witnesses at the hearing."   Although the neighbors argue that the board has violated R.C. 4906.07(A) by failing to hold a full hearing and considering testimony from the opponents before acting on Buckeye's application to construct wind turbines in Champaign County, the record belies this conclusion.

{¶ 9}   First, appellants were active participants throughout the administrative process. The neighbors and the Ohio Farm Bureau Federation were allowed to intervene on July 31, shortly after Buckeye had filed its initial application on April 24, 2009.  The townships of Goshen, Rush, Salem, Urbana, and Wayne, the city of Urbana, the Urbana Country Club, the Board of Commissioners of Champaign County, the Champaign Telephone Company, and the Piqua Shawnee Tribe also were permitted to intervene in the proceedings before the board.

{¶ 10} Second, these intervening parties, as well as the general public, had an opportunity to be heard.  A public informational hearing was held on June 10, 2008, shortly after Buckeye notified the board of its intention to apply for a

construction certificate. After the application was filed and staff conducted its investigation, a local public hearing was held, in accordance with Ohio Adm.Code 4906-7-01(A), on October 28, 2009, in North Lewisburg, Ohio. The adjudicatory hearing began on October 27, was continued on November 9, and initial testimony concluded on November 20, 2009; rebuttal testimony was presented on December 1 and 2, 2009.

{¶ 11} Third, the intervenors conducted discovery before the hearing, participated in pretrial hearings, and filed motions to ensure the presentation of written testimony and of witnesses. Buckeye called 11 witnesses, the board staff called 8, and intervenors presented 17. Forty-six people testified at the local public hearing.

{¶ 12} Fourth, the board's summary of the evidence, consideration of arguments for and against every point, and careful recitation of the requirements of R.C. 4906.10(A) are clearly presented in its opinion, order, and certificate, which was entered on March 22, 2009. The 101-page order is thorough and shows that the board considered all points of view, including the intervenors' positions on every issue.

B. *The Board Did Not Improperly Delegate Decisionmaking to Its Staff*

{¶ 13} We stated in *In re Application of Am. Transm. Sys., Inc*., 125 Ohio St.3d 333, 2010-Ohio-1841, 928 N.E.2d 427, ¶ 20-21:

> R.C. Chapter 4906, the board's enabling statute, expressly allows the board to delegate many responsibilities to subordinates. * * * R.C. 4906.02(C) states, "The chairman of the public utilities commission may assign or transfer duties among the commission's staff." * * *
>
> One responsibility, however, cannot be delegated: "the board's authority to grant certificates under section 4906.10 of the

Revised Code shall not be exercised by any officer, employee, or body other than the board itself." R.C. 4906.02(C).

{¶ 14} Appellants argue that the board improperly delegated its decisionmaking authority because the order allows staff members to (1) approve new sites for three turbines, (2) review and accept plans regarding the design and siting of electric-collection lines, transportation routing, tree clearing, emergency services, and complaint resolution, (3) resolve the maximum potential distance that a detached turbine blade could be thrown, and (4) determine the specific model of wind turbine to be used. The issues characterized as improperly deferred, however, simply require additional submissions that Buckeye will make to staff before the preconstruction conference.

{¶ 15} The order explains that the purpose of the preconstruction conference is to (1) demonstrate compliance with the requirements of other state and federal agencies, (2) demonstrate compliance with the certificate issued by the board, and (3) show that the complaint procedures address public concerns. Pub. Util. Comm. No. 08-666-EL-BGN, at 81-82 (2010). Nothing in the order suggests that actions would occur secretly—the board specifically acknowledges its duty under R.C. 4906.07 and expressly rejects the neighbors' claim that the public would be foreclosed from providing input:

Any party to a certificate application has an opportunity, as UNU has done in this matter, to oppose staff's recommended conditions or to propose additional conditions. Furthermore, the Board notes that, in accordance with Section 4906.07, Revised Code, *the Board is required to hold a hearing in the same manner as on the application, where the amendment of a certificate involves any*

*material increase in any environmental impact or substantial change in the location of all or a portion of the facility*.

(Emphasis added.) Id. at 82. Thus it appears that interested parties will have the right to file before the board if Buckeye violates the terms of the certificate.

{¶ 16} Contrary to arguments that the issues challenged by appellants must be finally resolved by the board before a certificate may be issued, R.C. 4906.10(A) allows a certificate to be issued *upon such conditions as the board considers appropriate*. The statutes authorize a dynamic process that does not end with the issuance of a construction certificate. The General Assembly vested the board with authority to allow its staff to monitor Buckeye's compliance with conditions that the board has set, conditions upon which the neighbors already had the chance to be heard.

{¶ 17} The board has limited Buckeye's certificate, adding 70 separate conditions. The board followed statutory requirements in establishing each one. The order recognizes that proper facility siting is subject to modification as the process continues—proposals are tested and matched to the defined conditions. Simply because certain matters are left for further review and possible public comment does not mean they have been improperly delegated to staff. Any material modification to the certificate is subject to hearing "in the same manner as on the application." The neighbors' right to be heard is safeguarded by R.C. 4906.07. Furthermore, Buckeye must continue to abide by the conditions as presently set by the board in the certificate.

{¶ 18} The board did not improperly delegate its responsibility to grant or deny a provisional certificate when it allowed for further fleshing out of certain conditions of the certificate.

### 1. Staff Review and Acceptance

{¶ 19} The board's staff is responsible for ensuring compliance in the field and initiating enforcement actions when needed. Condition 8 of the order requires Buckeye to submit a variety of reports that contain final, detailed descriptions of its construction plan. The neighbors were not foreclosed from an opportunity to explore these matters at the hearing. The provision requesting additional submissions is designed to ensure compliance with the conditions already ordered by the board.

### 2. Concerns over Blade Shear

{¶ 20} In its order, the board considered the possibility that a rotor blade may drop or be thrown from the turbine, a situation known as "blade shear." There is testimony in the record that previous instances of blade shear involved a blade model not considered by Buckeye. The board adopted Condition 33, which states: "Prior to the preconstruction conference, Buckeye shall provide staff with both the maximum potential distance for a blade shear event from the three turbine models under consideration and the formula used to calculate the distance."

{¶ 21} Buckeye presented evidence that no member of the public has ever been injured by blade shear, that technology now includes two independent braking systems that will automatically shut down a turbine at wind speeds over the manufacturer's threshold, and that turbines will stop if significant vibrations or rotor-blade stress is sensed by the monitoring systems. The board found that Buckeye "sufficiently demonstrated that the setbacks, as currently configured, when combined with advances in wind turbine technology, are sufficient to protect residents from any risk of blade shear." Pub. Util. Comm. No. 08-666-EL-DGN, 42-43. Condition 33 mitigates the risk of injury even further by adopting the staff's recommendation that Buckeye provide a formula to support its consultant's calculations. The board specifically found that this condition

responded to the neighbors' concerns. Given these measures, the board did not act unreasonably or unlawfully in addressing the blade-shear concerns.

### 3. Turbine Relocation

{¶ 22} Conditions 45 and 46 pertain to turbines 70 and 57, for which the proposed locations were not approved. The order provides that if Buckeye chooses to modify the location of these turbines, additional information must be submitted to the staff for review and approval before construction, and Buckeye "shall comply" with all conditions of the order, including setbacks. Condition 40 provides that the location of turbine 37 is conditioned upon "an in-depth vertical Fresnel-Zone analysis" to determine whether relocation of the turbine is necessary because of microwave interference. By providing clear directions stating where turbines may not be placed and guidelines setting forth requirements for permissible sites, the board did not unreasonably or unlawfully give the staff general discretion to approve new sites.

### 4. Choice of Turbine Model

{¶ 23} Condition 49 provides:

> At least 60 days prior to construction, Buckeye shall file a letter with the Board that identifies which of the three turbine models listed in the application has been selected. If Buckeye selects a turbine model other than one of the three models listed in the application, in addition to the letter, Buckeye shall also: file copies of the safety manual for the turbine model selected and manufacturer contact information; and provide assurances that no additional negative impacts would be introduced by the model selected.

{¶ 24} No issue will arise unless Buckeye selects a turbine model other than the models listed in its application. However, the conditions of the certificate must be met, and there must be assurances that the turbines will have no negative impacts. The conditions under which the proposed turbines have been evaluated were based upon a worst-case scenario (the model with the greatest potential impact was evaluated), according to staff member Stuart Siegfried. If a different model were selected than the one proposed, any potential impact necessarily would be lessened. This is hardly a blank check for Buckeye.

{¶ 25} Furthermore, any choice of turbine model by Buckeye will be a matter of public record. As a board created within the Public Utilities Commission of Ohio, R.C. 4906.02, all facts and information in the board's possession "shall be public, and all reports, records, files, books, accounts, papers, and memorandums of every nature in its possession shall be open to inspection by interested parties or their attorneys." R.C. 4905.07.

### III. The Board's Order Should Be Affirmed

*A. The Board's Order Followed Statutory Requirements*

{¶ 26} The board has exclusive jurisdiction over construction of wind farms such as the one proposed by Buckeye. *See* R.C. 4906.13. Pursuant to R.C. 4906.12, this court must apply the same standard of review to power-siting determinations that it applies to orders of the Public Utilities Commission. *Accord Chester Twp. v. Power Siting Comm.*, 49 Ohio St.2d 231, 238, 361 N.E.2d 436 (1977). "R.C. 4903.13 applies to board proceedings pursuant to R.C. 4906.12 and provides that an order 'shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable.' " *In re Application of Am. Transm. Sys., Inc.*, 125 Ohio St.3d 333, 2010-Ohio-1841, 928 N.E.2d 427, ¶ 17, quoting *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We have " 'complete and independent power of review as to all

questions of law' " in appeals from the board.  *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 121 Ohio St.3d 362, 2009-Ohio-604, 904 N.E.2d 853, ¶ 13, quoting *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997).

**{¶ 27}** In granting a certificate for the construction, operation, and maintenance of a major utility facility, the board must determine eight specific points.  R.C. 4906.10(A).[1]  And if the board conditions issuance of a certificate

---

1. R.C. 4906.10 states:

   (A) The power siting board shall render a decision upon the record either granting or denying the application as filed, or granting it upon such terms, conditions, or modifications of the construction, operation, or maintenance of the major utility facility as the board considers appropriate. The certificate shall be conditioned upon the facility being in compliance with standards and rules adopted under sections 1501.33, 1501.34, and 4561.32 and Chapters 3704., 3734., and 6111. of the Revised Code. The period of initial operation under a certificate shall expire two years after the date on which electric power is first generated by the facility. During the period of initial operation, the facility shall be subject to the enforcement and monitoring powers of the director of environmental protection under Chapters 3704., 3734., and 6111. of the Revised Code and to the emergency provisions under those chapters. If a major utility facility constructed in accordance with the terms and conditions of its certificate is unable to operate in compliance with all applicable requirements of state laws, rules, and standards pertaining to air pollution, the facility may apply to the director of environmental protection for a conditional operating permit under division (G) of section 3704.03 of the Revised Code and the rules adopted thereunder. The operation of a major utility facility in compliance with a conditional operating permit is not in violation of its certificate. After the expiration of the period of initial operation of a major utility facility, the facility shall be under the jurisdiction of the environmental protection agency and shall comply with all laws, rules, and standards pertaining to air pollution, water pollution, and solid and hazardous waste disposal.

   The board shall not grant a certificate for the construction, operation, and maintenance of a major utility facility, either as proposed or as modified by the board, unless it finds and determines all of the following:

   (1) The basis of the need for the facility if the facility is an electric transmission line or gas or natural gas transmission line;

   (2) The nature of the probable environmental impact;

   (3) That the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations;

   (4) In the case of an electric transmission line or generating facility, that the facility is consistent with regional plans for expansion of the electric power grid of the electric systems serving this state and interconnected utility systems and that the facility will serve the interests of electric system economy and reliability;

   (5) That the facility will comply with Chapters 3704., 3734., and 6111. of the Revised Code and all rules and standards adopted under those chapters and under sections 1501.33, 1501.34, and 4561.32 of the Revised Code. In determining whether the facility will comply with all rules and

upon modification of the location of the facility, it may add that condition. R.C. 4906.10(B).[2] In this matter, the board issued a detailed 101-page order on March 22, 2010, granting a certificate to Buckeye for the construction, operation, maintenance, and decommissioning of the proposed wind-powered electric generation facility as modified by 70 separate conditions.

{¶ 28} The neighbors maintain that the board's imposition of six conditions—8, 33, 40, 45, 46, and 49—supports a conclusion that the board asked the staff to make its decisions, not enforce them. Condition 8 requires Buckeye to submit plans for staff review and acceptance. Condition 33 requires Buckeye to provide a calculation of "the maximum potential distance for a blade shear event." Conditions 40, 45, and 46 relate to the approval of three turbine sites. And condition 49 requires specific identification of the turbine model to be used.

{¶ 29} If Buckeye provides further information to the board's staff that would require an amendment of the certificate, the board is required to hold a hearing on the amendment:

---

standards adopted under section 4561.32 of the Revised Code, the board shall consult with the office of aviation of the division of multi-modal planning and programs of the department of transportation under section 4561.341 of the Revised Code.

(6) That the facility will serve the public interest, convenience, and necessity;

(7) In addition to the provisions contained in divisions (A)(1) to (6) of this section and rules adopted under those divisions, what its impact will be on the viability as agricultural land of any land in an existing agricultural district established under Chapter 929. of the Revised Code that is located within the site and alternative site of the proposed major utility facility. Rules adopted to evaluate impact under division (A)(7) of this section shall not require the compilation, creation, submission, or production of any information, document, or other data pertaining to land not located within the site and alternative site.

(8) That the facility incorporates maximum feasible water conservation practices as determined by the board, considering available technology and the nature and economics of the various alternatives.

2. R.C. 4906.10(B) states: "If the board determines that the location of all or a part of the proposed facility should be modified, it may condition its certificate upon that modification, provided that the municipal corporations and counties, and persons residing therein, affected by the modification shall have been given reasonable notice thereof."

On an application for an amendment of a certificate, *the board shall hold a hearing in the same manner as a hearing is held on an application for a certificate* if the proposed change in the facility would result in any material increase in any environmental impact of the facility or a substantial change in the location of all or a portion of such facility * * * .

(Emphasis added.)  R.C. 4906.07(B).

{¶ 30} But the board must retain authority to determine what is subject to hearing—surely not every issue (e.g., whether white or gray screws are used in the control room), as that would be unworkable.  In this case, we conclude that the board reasonably drew the line regarding the issuance of the certificate and the imposition of its conditions.

### B. Further Hearing Is Unnecessary

{¶ 31} The dissenters argue that this matter should be remanded for further hearing.  It is difficult to understand what additional hearings might accomplish.  All the issues were debated at length by the parties and witnesses at the evidentiary hearing.  Buckeye must comply with the certificate and its conditions as imposed by the board.  This certificate is based explicitly upon public information as set forth in the application and at the hearing.  Furthermore, we emphasize that the board specifically recognized in its order that "in accordance with Section 4906.07, Revised Code, the Board is required to hold a hearing in the same manner as on the application, where the amendment of a certificate involves any material increase in any environmental impact or substantial change in the location of all or a portion of the facility."  Pub. Util. Comm. No. 08-666-EL-BGN, at 82.  Contrary to the dissenters' argument, the public was provided with a full opportunity for hearing, and further hearings may be held if significant changes are made to the certificate.

12

**{¶ 32}** The board's order allows Buckeye to provide additional information on several issues as the construction process evolves. But Buckeye must construct its wind farm in accordance with the certificate issued by the board. R.C. 4906.98. Penalties may be assessed if Buckeye does not comply with the certificate. R.C. 4906.97. We now hold that the board acted within its authority in granting Buckeye's certificate based on its 70 conditions. There is no need for delay.

**{¶ 33}** The neighbors' first three propositions of law assert that the operational noise limits set by the board are either vague or unreasonable. To the contrary, the order sets discernible noise limits. That the standard is flexible poses no legal problem—an agency, particularly when facing new issues, may proceed on an incremental, case-by-case basis. *See Securities & Exchange Comm. v. Chenery Corp.,* 332 U.S. 194, 202-203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (an "agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule," and thus "the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective"). As for the neighbors' proposed standards, the testimony of Buckeye's acoustic consultant showed that they were unrealistic and would effectively prohibit the development of wind energy in Ohio. Thus, the board properly rejected appellants' proposals.

**{¶ 34}** The neighbors' fourth proposition contends that the board-approved setbacks are not supported by the record, but ample evidence supports the order, and numerous conditions in the order will ensure their adequacy. The fifth proposition asserts that one of Buckeye's witnesses lacked sufficient expert knowledge to testify regarding technical issues. The neighbors have not shown that he lacked expert knowledge or that they were prejudiced. Finally, in its sixth proposition, the neighbors assert that the board erred by disallowing the testimony

of one of its witnesses. The witness was unable to attend the hearing, and the neighbors have not shown that the board erred in requiring his attendance.

{¶ 35} Finally, the political-subdivision appellants do not present any arguments that warrant reversal. The pertinent statutes do not require the county engineer to have final say over the amount of any road bond, and evidence introduced at the hearing supported the amount required for the decommissioning bond.

## IV. Conclusion

{¶ 36} Pursuant to R.C. 4906.12, we must apply the same standard of review to determinations of the Power Siting Board as we do to orders of the Public Utilities Commission. *Accord Chester Twp.,* 49 Ohio St.2d at 238, 361 N.E.2d 436. An order "shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50.

{¶ 37} The General Assembly has enacted statutes to require utilities to provide a portion of their electricity supply from alternative energy sources by 2025. R.C. 4928.64 and 4928.65. Our decision today does not give the board a free pass to avoid dealing with controversial or complex issues or to resolve issues without public participation or judicial review. To the contrary, the statutory process within R.C. Chapter 4906 is detailed and requires input of various stakeholders before a certificate is granted for construction of a new electric generation facility. In this case, the board has followed all statutes and has based its determinations on the evidence in the record. The board's decision is reasonable and lawful, and the order is therefore affirmed.

Order affirmed.

O'CONNOR, C.J., and MCGEE BROWN, J., concur.

O'DONNELL, J., concurs in judgment only.

14

PFEIFER, LUNDBERG STRATTON, and CUPP, JJ., dissent.

_____

**PFEIFER, J., dissenting.**

{¶ 38} "Ill blows the wind that profits nobody." William Shakespeare, *Henry VI, Part III,* Act II, Scene 5.

{¶ 39} I join Justice Stratton's dissent. I further dissent because I would hold in favor of appellants Champaign County and Goshen, Salem, and Union Townships on the decision of the Ohio Power Siting Board ("OPSB") regarding bonding to cover the cost of removing decommissioned windmills.

{¶ 40} How many windmills does it take to power a light bulb? As many as the government will subsidize. It may not be geographically preposterous to build windmills in Ohio—not like building a solar energy farm in Upper Sandusky—since we do have wind. But for how long will government be willing to subsidize a form of energy production that is uneconomical and undependable? The mechanical obsolescence of windmills is one matter of concern; that is, what will become of these whopping, white whirligigs when they become technologically outmoded even in comparison to other windmills?

{¶ 41} But there is a bigger concern. The winds that really power alternative-energy projects like these, political winds, are also subject to change, sometimes abrupt change. From a recent article in the *Chicago Tribune*:

> The wind power industry is predicting massive layoffs and stalled or abandoned projects after a deal to renew a tax credit failed Thursday in Washington.
>
> The move is expected to have major ramifications in states such as Illinois, where 13,892 megawatts of planned wind projects—enough to power 3.3 million homes per year—are seeking to be connected to the electric grid. Many of those projects

will be abandoned or significantly delayed without federal subsidies.

Chicago Tribune, *End of Tax Credit a Blow for Wind Power Industry,* http://www.chicagotribune.com/business/ct-biz-0217-wind-ptc-20120217,0,7153 601.story?page=1 (accessed Feb. 17, 2012).

{¶ 42} When windmill welfare ends, the companies that build windmills, dependent as they are on government largesse and regulation, will disappear. Then what? Ohio's public utilities do not own the windmills—they are just forced to purchase the power generated from them—and will thus be under no obligation to decommission them. Windmills will become relics, 492-foot-tall white elephants, monuments to our quixotic quest for alternative energy. One such monument would do the trick; 70 are too many for Champaign County.

{¶ 43} Granted, in this case we are dealing with the amount of a bond to cover the period from the commencement of construction of the windmills through the first year. The OPSB set that bond at $5,000 per turbine, despite the fact that the board heard testimony from appellants' expert that decommissioning could cost as much as $300,000 per turbine. But Buckeye Wind's witness testified that it is "inconceivable" that the project will need to be decommissioned within the first five years. He uses that word "inconceivable," but I do not think it means what he thinks it means. The technology behind the windmills might prove untouchable for five years, but it is entirely conceivable that the bottom could drop out of the market for wind power or that Buckeye Wind could fail as a company. It would not be the first alternative-energy concern to turn off its lights. The question is not whether the turbines work, it's whether the economics work. The answer to our energy future is likely not blowing in the wind.

{¶ 44} It is incumbent on the OPSB to insist that there is reasonable protection for the decommissioning of windmills, whenever that

16

decommissioning might occur. There was no evidence presented at the hearing that the $5,000 per turbine required by the OPSB is adequate in any way to actually bring down a windmill. No witness testified that that nominal amount was sufficient to protect the public interest if the windmills were abandoned.

{¶ 45} And the public most certainly has an interest that needs protection. The interest does not lie just with the homeowners who thought they were buying a little piece of rural heaven in Champaign County and now have their pristine views obscured. The public at large has an interest because, ultimately, the state could be left to deal with the aftermath of a failed experiment.

{¶ 46} I suspect that this latest generation of windmills will go the way of the leisure suit: fashionable for a time, but ultimately causing us to say, "What were we thinking?" But there's no Goodwill store in the world big enough to take them off our hands.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

_____

**LUNDBERG STRATTON, J., dissenting.**

{¶ 47} The Power Siting Board is vested with an important public power, and it is frequently called upon to resolve disputes between major utility companies and ordinary citizens. Today's decision allows the board to sidestep public scrutiny and judicial review whenever it desires. But the public's business should be done in public, and that is not only common sense, it is the law. Therefore, I dissent.

### I. The board and lead opinion have denied the citizens affected by this project their only opportunity to be heard.

{¶ 48} In our state, the power to oversee the construction and operation of major utility facilities has been given to one entity alone: the Power Siting Board. Local authorities—elected representatives, zoning commissions, county courts— have no say over whether, where, or how major power projects may be built and

run. R.C. 4906.13. So when the neighboring landowners, appellants in this case, learned that Buckeye wanted to build wind turbines the height of skyscrapers only a few hundred feet from their land and homes, they went to the board, the only place they could go.

{¶ 49} The neighbors' investigation of the project turned up some very real concerns. Take one for example: Wind turbines are very large machines, and machines can break down. One type of breakdown is known as "blade shear," that is, a blade shearing off at the hub. Blade shear would present a serious risk of danger, to say the least. The blades are mounted over 300 feet from the ground, reach almost 500 feet into the air, and stretch half the length of a football field.

{¶ 50} Buckeye assured the board that a shorn blade could fly only 500 feet. That was only 41 feet less than the minimum setback from neighboring properties, leaving little margin for error. When the board's staff asked Buckeye for supporting data, it turned out that Buckeye's prediction pertained to a different, smaller turbine, and the company informed staff that "no such calculation existed" for the proposed turbines. Nevertheless, despite lacking either evidence or sufficient competence in physics *even to attempt* to calculate the distance a blade could fly, the staff member responsible signed off on Buckeye's proposal. His portion of the investigatory report stated, "Staff believes that the Applicant has adequately evaluated and described the potential impact from blade shear at the nearest property boundary."

{¶ 51} Understandably, the neighbors neither were satisfied with this investigation nor wanted to be the guinea pigs in a blade-shear experiment, so they took this issue to the board. But the board, rather than withhold approval of the project until safe setbacks were determined, approved the project. It simply required Buckeye to provide staff, and no one else, with the "formula" used to calculate the distance a blade could be thrown. Since this same staff had lacked the competence to even attempt such a calculation in the first place, it is open to

18

question what good providing such a formula would do. And the board did *not* require Buckeye or staff to share the formula with other parties, to file it in the public record, or otherwise to resubmit the issue for review, so no one else would ever be entitled to scrutinize Buckeye's calculations.

{¶ 52} Thus, even though this appeal represents the final review of the final order of the board, we have no evidence that the project is being built safely away from yards and homes, and we never will. Yet the lead opinion affirms the order.[3]

{¶ 53} The law requires otherwise. The legislature has required the board to settle issues like this up front on a public record, and it specifically guarantees affected citizens the right to participate in the review process and to have their voices heard. *See* R.C. 4906.07 (requiring that the board hold public hearings), 4906.08(A)(3) (neighboring citizens are entitled both to party status and to call and examine witnesses), 4906.09 (requiring the board to keep a record of its proceedings), 4906.10(A) (requiring the board to make all substantive determinations before authorizing construction), and 4906.11 (requiring the board to issue a written opinion stating the reasons for its decisions). Issues are not to be settled *after* construction is approved, much less by unaccountable staff members without public scrutiny or judicial review. Yet that is precisely what the board, and now the lead opinion, has allowed.

---

3. This is not the only major issue that the board left unresolved. Among other things, the board approved this project but allowed its staff to approve *new locations* for several turbines. It also allowed Buckeye to use new turbines that had not been examined at hearing—even though Buckeye's own witness had admitted on the record that if a different turbine were used than the ones that he had studied, his "whole analysis would have to be rerun."

## II. The lead opinion does not offer any workable response
## to the denial of the citizens' right to a public hearing.

{¶ 54} The lead opinion suggests there are three remedies now available to the neighbors, but none of them cures the problem. The lead opinion ignores the solution plainly required by law: give the neighbors their hearing.

### A. The order plainly permits nonpublic proceedings.

{¶ 55} First, the lead opinion states that "[n]othing in the order suggests that [staff's] actions would occur secretly." That is simply not true. Each one of the issues challenged by appellants as improperly delegated allows the staff to resolve those issues either *alone* or *in consultation with Buckeye alone*. *In re Application of Buckeye Wind*, Pub. Util. Comm. No. 08-666-EL-BGN, at 83-84 (2010) (collection system plan, complaint procedures, and other issues), 90 (Blade throw), 91 (relocation of turbines), and 92 (turbine model). The order does not require that notice be given of the time and place of any meeting with Buckeye. The order does not require records to be kept of these meetings. The order does not require that other parties be allowed to attend. The order does not require that materials shared at these meetings be shared with other parties. The order does not require that decisions be put in writing. The order does not require further review by the board. And the effect of all this is to avoid any further review by this court.

{¶ 56} This suggests secrecy in any meaningful sense. The lead opinion points to no provisions that cut the other way, i.e., that allow third-party participation or review. Although the board did not affirmatively order that its staff meet with Buckeye alone at an undisclosed time and place without keeping records or putting decisions in writing, it has allowed such secret meetings to occur.

**B. The statute cited in the lead opinion offers the neighbors no protection.**

{¶ 57} The lead opinion also suggests that the neighbors will have additional process before the board. But the order and the statutes point the other way.

{¶ 58} The lead opinion claims that the board did not foreclose the neighbors from providing input. This is not true. In fact, the portion of the order quoted by the lead opinion makes precisely the opposite point, stating that the neighbors have *already* had their chance: "Any party to a certificate application has an opportunity, *as [the group of neighbors] has done in this matter*, to oppose staff's recommended conditions or to propose additional conditions." (Emphasis added.) The board's appellate brief confirms this point. Rather than assure us that the neighbors will have any additional process, the board asserts that they have received "all [the process] that is required."

{¶ 59} The lead opinion also states that there are statutes that give the neighbors "the right to file before the board if Buckeye violates its certificate." It cites R.C. 4906.07, but that section does not authorize the neighbors to do anything; it authorizes *Buckeye* to file "an application for an amendment of a certificate." Buckeye will never need to amend its certificate as far as the issues delegated to the staff are concerned. The certificate does not create a substantive standard to govern the project, but simply requires meetings with staff. So long as Buckeye meets with staff, it will not—it cannot—run afoul of the pertinent parts of its certificate. Where there is no rule, there can be no violation, and there will be no need for an amendment.

{¶ 60} Two other statutes, R.C. 4906.97 and 4906.98, do authorize the neighbors to complain to the board if Buckeye builds or runs its project "other than in compliance with the certificate [it] has obtained." R.C. 4906.98(B). But the same problem presents itself; as to the issues delegated to the staff, the certificate *does not create any standard to govern the project*. It simply requires a

meeting with staff. Once Buckeye meets with staff, it has complied with the certificate, the staff's decisions will be implemented, and any complaint for a violation of the certificate would fail.

{¶ 61} Finally, even if the neighbors did have some mechanism to challenge staff's decisions in the future, that remedy would not justify disregarding the neighbors' right to a hearing now. Realistically, overturning a decision after it has been made and implemented presents a higher hurdle than swaying a decision up front—it is always harder to unring the bell. And if the neighbors were somehow to prevail on a postconstruction complaint, this could impose significant costs on Buckeye.

{¶ 62} Suppose that Buckeye chooses a different turbine than the model analyzed at hearing; the order allows Buckeye to do so on the simple condition that it "provide assurances that no additional negative impacts would be introduced."[4] Suppose that despite Buckeye's assurances, the new turbine turns out to be loud enough that it violates the noise standards in the certificate. The neighbors would be legally entitled to have the turbines shut down, replaced, or removed. But surely the more efficient, cost-effective outcome would have been to analyze and reject the offending model *before* it was purchased and installed.

### C. R.C. 4906.10(A) requires the board to resolve relevant, material issues *before* it grants a certificate.

{¶ 63} Finally, the lead opinion states that R.C. 4906.10(A) does not require that issues be "finally resolved by the board before a certificate may be issued." This simply ignores the language of the statute.

{¶ 64} R.C. 4906.10(A) states, "The board shall not grant a certificate * * *, either as proposed or as modified by the board, unless it" makes the

---

4. In fairness, Buckeye also had to provide staff with copies of the safety manual and manufacturer contact information.

required findings and determinations. The default position is "shall not grant," and that only changes when the board makes its findings and determinations. All of the issues delegated by the board related to one or more of those necessary findings. So, contrary to the lead opinion's statement, the law required these issues to be resolved before the certificate is issued.

{¶ 65} The irony here is that the lead opinion, in making these points, seems to recognize that allowing unaccountable staff members to resolve issues in private is a problem. But it offers no workable solution to that problem. The necessary solution is simply to reverse the order and require that accountable persons resolve these issues after following the public process required by law.

### III. Today's decision renders ineffectual the laws designed to protect the interests of citizens living near proposed utility projects.

{¶ 66} The outcome of this decision is unfortunate for anyone living near the site of a proposed high-voltage transmission line, electric substation, high-pressure gas pipeline, or generation plant. If the board runs into an issue that for whatever reason it does not want to deal with—or if it simply prefers to resolve an issue without the discomfort of public participation and judicial review—it now has a broad off-ramp. Approve the project now; work out the details with the company later. The public retains a formal right to participate, but it is up to the board whether that right amounts to anything more than a formality.

{¶ 67} This is not alarmist but precisely what happened in this case. If, as it did in this case, the power siting board can delegate the very *siting* of facilities—its core duty, the duty from which the power siting board derives its name—it can delegate anything and everything. The lead opinion identifies no enforceable limits on the board's power to delegate but apparently trusts that the board will exercise its new discretion wisely. One can hope that the lead opinion's trust proves well founded, but in my view, the public's business should not be left to the unreviewable discretion of appointed staff members who are not

accountable to the public. The board's decisions should have to see and bear the light of day.

**{¶ 68}** For these reasons, I dissent, and I would reverse the order and remand this case for completion of the public proceeding required by law.

PFEIFER and CUPP, JJ., concur in the foregoing opinion.

———————————

Van Kley & Walker, L.L.C., Jack Van Kley, and Christopher A. Walker, for appellants Union Neighbors United, Robert McConnell, Diane McConnell, and Julia F. Johnson.

Nick A. Selvaggio, Champaign County Prosecuting Attorney, and Jane A. Napier, Assistant Prosecuting Attorney, for appellants Champaign County and Goshen, Salem, and Union Townships.

Michael DeWine, Attorney General, and William L. Wright, Werner L. Margard III, and John H. Jones, Assistant Attorneys General, for appellee.

Vorys, Sater, Seymour & Pease, L.L.P., M. Howard Petricoff, Stephen M. Howard, and Michael J. Settineri, for intervening appellee, Buckeye Wind, L.L.C.

Larry Gearhardt, Chad A. Endsley, and Leah F. Finney, urging affirmance for amicus curiae, Ohio Farm Bureau Federation.

———————————