Lanzinger, J.
{¶ 1} This is the first time that we have reviewed an order involving the grant of authority to construct a proposed wind-powered electric generation facility. After full review of the record and consideration of the parties’ arguments, we hold that the order of the Power Siting Board should be affirmed because the board acted in accordance with all pertinent statutes and regulations.
I. Background
{¶2} The General Assembly enacted legislation, 2007 Am.Sub.S.B. No. 221, effective July 31, 2008, to require utilities to provide a portion of their electricity supply from alternative energy sources by 2025. See R.C. 4928.64 and 4928.65. The term “alternative energy resource” includes a “renewable energy resource.” R.C. 4928.64(A)(1). Wind energy is listed within the definition of “renewable energy resource.” R.C. 4928.01(A)(35). Under R.C. 4906.03, the board has been granted exclusive authority to issue certificates for construction, operation, and maintenance of major utility facilities.
{¶ 3} A private developer, Buckeye Wind, L.L.C. (“Buckeye”), developed a plan to build 70 wind turbines over approximately 9,000 acres in Champaign County, Ohio, where Buckeye perceived a favorable blend of wind, open land, and access to the electric power grid. This project is one of the first wind farms in Ohio. The wind farm’s expected generation capacity exceeded 126 megawatts, qualifying it under R.C. 4906.01(B)(1) as a “major utility facility” that required the approval of the board. R.C. 4906.03.
*450 {¶ 4} In April 2009, Buckeye filed with the board a 1,500-page application for a certificate of environmental compatibility and public need. See R.C. 4906.04. A group of neighboring landowners, Union Neighbors United (“UNU”), Robert and Diane McConnell, and Julia Johnson (collectively, “the neighbors”), opposed the application. Several other entities, including Champaign County and several local townships (collectively, “the county”), also intervened.
{¶ 5} The neighbors were concerned about noise and the turbines’ proposed setbacks of 914 feet from homes and 541 feet from property lines. Wind turbines such as those proposed by Buckeye can stand as tall as 328 feet, with a blade at the highest point being 492 feet high. The neighbors also raised issues of “shadow flicker,” a potentially annoying phenomenon caused by the swinging of turbine blades between the ground and the sun, and the possibility of blade detachment. Unlike landowner-lessors who host turbines, the neighbors received no compensation from Buckeye, and they also noted the effect the proposed' facility could have on property values. The board rejected most of the neighbors’ requests and approved construction of most of the proposed turbines.
{¶ 6} The county did not oppose the siting of the turbines but sought financial protection through bond requirements that would ensure that adequate money was available to (1) repair any roads damaged by the project and (2) remove (or “decommission”) the turbines if and when they became inoperable. The board agreed to require a $5,000 bond for the first year of operation. The county was dissatisfied with the bond amount as well as the fact that the Champaign County Engineer did not have final say on the amount.
{¶ 7} The county appealed, as did the neighbors. Buckeye intervened on behalf of the board. The county raised three propositions of law, the neighbors raised ten propositions of law, and the Ohio Farm Bureau filed an amicus brief urging affirmance.
II. Legal Analysis

A. The Board Conducted Appropriate Public Hearings

{¶ 8} In their ninth proposition of law, the neighbors argue that the board deprived the neighbors of “the statutory right to call and examine witnesses at the hearing.” Although the neighbors argue that the board has violated R.C. 4906.07(A) by failing to hold a full hearing and considering testimony from the opponents before acting on Buckeye’s application to construct wind turbines in Champaign County, the record belies this conclusion.
{¶ 9} First, appellants were active participants throughout the administrative process. The neighbors and the Ohio Farm Bureau Federation were allowed to intervene on July 31, shortly after Buckeye had filed its initial application on April 24, 2009. The townships of Goshen, Rush, Salem, Urbana, and Wayne, the *451 city of Urbana, the Urbana Country Club, the Board of Commissioners of Champaign County, the Champaign Telephone Company, and the Piqua Shawnee Tribe also were permitted to intervene in the proceedings before the board.
{¶ 10} Second, these intervening parties, as well as the general public, had an opportunity to be heard. A public informational hearing was held on June 10, 2008, shortly after Buckeye notified the board of its intention to apply for a construction certificate. After the application was filed and staff conducted its investigation, a local public hearing was held, in accordance with Ohio Adm.Code 4906-7-01(A), on October 28, 2009, in North Lewisburg, Ohio. The adjudicatory hearing began on October 27, was continued on November 9, and initial testimony concluded on November 20, 2009; rebuttal testimony was presented on December 1 and 2, 2009.
{¶ 11} Third, the intervenors conducted discovery before the hearing, participated in pretrial hearings, and filed motions to ensure the presentation of written testimony and of witnesses. Buckeye called 11 witnesses, the board staff called 8, and intervenors presented 17. Forty-six people testified at the local public hearing.
{¶ 12} Fourth, the board’s summary of the evidence, consideration of arguments for and against every point, and careful recitation of the requirements of R.C. 4906.10(A) are clearly presented in its opinion, order, and certificate, which was entered on March 22, 2009. The 101-page order is thorough and shows that the board considered all points of view, including the intervenors’ positions on every issue.

B. The Board Did Not Improperly Delegate Decisionmaking to Its Staff

{¶ 13} We stated in In re Application of Am. Transm. Sys., Inc., 125 Ohio St.3d 333, 2010-Ohio-1841, 928 N.E.2d 427, ¶ 20-21:
R.C. Chapter 4906, the board’s enabling statute, expressly allows the board to delegate many responsibilities to subordinates. * * * R.C. 4906.02(C) states, “The chairman of the public utilities commission may assign or transfer duties among the commission’s staff.” * * *
One responsibility, however, cannot be delegated: “the board’s authority to grant certificates under section 4906.10 of the Revised Code shall not be exercised by any officer, employee, or body other than the board itself.” R.C. 4906.02(C).
{¶ 14} Appellants argue that the board improperly delegated its decisionmaking authority because the order allows staff members to (1) approve new sites for three turbines, (2) review and accept plans regarding the design and siting of *452 electric-collection lines, transportation routing, tree clearing, emergency services, and complaint resolution, (3) resolve the maximum potential distance that a detached turbine blade could be thrown, and (4) determine the specific model of wind turbine to be used. The issues characterized as improperly deferred, however, simply require additional submissions that Buckeye will make to staff before the preconstruction conference.
{¶ 15} The order explains that the purpose of the preconstruction conference is to (1) demonstrate compliance with the requirements of other state and federal agencies, (2) demonstrate compliance with the certificate issued by the board, and (3) show that the complaint procedures address public concerns. Pub. Util. Comm. No. 08-666-EL-BGN, at 81-82 (2010). Nothing in the order suggests that actions would occur secretly — the board specifically acknowledges its duty under R.C. 4906.07 and expressly rejects the neighbors’ claim that the public would be foreclosed from providing input:
Any party to a certificate application has an opportunity, as UNU has done in this matter, to oppose staffs recommended conditions or to propose additional conditions. Furthermore, the Board notes that, in accordance with Section 4906.07, Revised Code, the Board is required to hold a hearing in the same manner as on the application, where the amendment of a certificate involves any material increase in any environmental impact or substantial change in the location of all or a portion of the facility.
(Emphasis added.) Id. at 82. Thus it appears that interested parties will have the right to file before the board if Buckeye violates the terms of the certificate.
{¶ 16} Contrary to arguments that the issues challenged by appellants must be finally resolved by the board before a certificate may be issued, R.C. 4906.10(A) allows a certificate to be issued upon such conditions as the board considers appropriate. The statutes authorize a dynamic process that does not end with the issuance of a construction certificate. The General Assembly vested the board with authority to allow its staff to monitor Buckeye’s compliance with conditions that the board has set, conditions upon which the neighbors already had the chance to be heard.
{¶ 17} The board has limited Buckeye’s certificate, adding 70 separate conditions. The board followed statutory requirements in establishing each one. The order recognizes that proper facility siting is subject to modification as the process continues — proposals are tested and matched to the defined conditions. Simply because certain matters are left for further review and possible public comment does not mean they have been improperly delegated to staff. Any *453 material modification to the certificate is subject to hearing “in the same manner as on the application.” The neighbors’ right to be heard is safeguarded by R.C. 4906.07. Furthermore, Buckeye must continue to abide by the conditions as presently set by the board in the certificate.
{¶ 18} The board did not improperly delegate its responsibility to grant or deny a provisional certificate when it allowed for further fleshing out of certain conditions of the certificate.

1. Staff Review and Acceptance

{¶ 19} The board’s staff is responsible for ensuring compliance in the field and initiating enforcement actions when needed. Condition 8 of the order requires Buckeye to submit a variety of reports that contain final, detailed descriptions of its construction plan. The neighbors were not foreclosed from an opportunity to explore these matters at the hearing. The provision requesting additional submissions is designed to ensure compliance with the conditions already ordered by the board.

2. Concerns over Blade Shear

{¶ 20} In its order, the board considered the possibility that a rotor blade may drop or be thrown from the turbine, a situation known as “blade shear.” There is testimony in the record that previous instances of blade shear involved a blade model not considered by Buckeye. The board adopted Condition 33, which states: “Prior to the preconstruction conference, Buckeye shall provide staff with both the maximum potential distance for a blade shear event from the three turbine models under consideration and the formula used to calculate the distance.”
{¶ 21} Buckeye presented evidence that no member of the public has ever been injured by blade shear, that technology now includes two independent braking systems that will automatically shut down a turbine at wind speeds over the manufacturer’s threshold, and that turbines will stop if significant vibrations or rotor-blade stress is sensed by the monitoring systems. The board found that Buckeye “sufficiently demonstrated that the setbacks, as currently configured, when combined with advances in wind turbine technology, are sufficient to protect residents from any risk of blade shear.” Pub. Util. Comm. No. 08-666-EL-DGN, 42-43. Condition 33 mitigates the risk of injury even further by adopting the staffs recommendation that Buckeye provide a formula to support its consultant’s calculations. The board specifically found that this condition responded to the neighbors’ concerns. Given these measures, the board did not act unreasonably or unlawfully in addressing the blade-shear concerns.

*454
3. Turbine Relocation

{¶ 22} Conditions 45 and 46 pertain to turbines 70 and 57, for which the proposed locations were not approved. The order provides that if Buckeye chooses to modify the location of these turbines, additional information must be submitted to the staff for review and approval before construction, and Buckeye “shall comply” with all conditions of the order, including setbacks. Condition 40 provides that the location of turbine 37 is conditioned upon “an in-depth vertical Fresnel-Zone analysis” to determine whether relocation of the turbine is necessary because of microwave interference. By providing clear directions stating where turbines may not be placed and guidelines setting forth requirements for permissible sites, the board did not unreasonably or unlawfully give the staff general discretion to approve new sites.
J. Choice of Turbine Model
{¶ 23} Condition 49 provides:
At least 60 days prior to construction, Buckeye shall file a letter with the Board that identifies which of the three turbine models listed in the application has been selected. If Buckeye selects a turbine model other than one of the three models listed in the application, in addition to the letter, Buckeye shall also: file copies of the safety manual for the turbine model selected and manufacturer contact information; and provide assurances that no additional negative impacts would be introduced by the model selected.
{¶ 24} No issue will arise unless Buckeye selects a turbine model other than the models listed in its application. However, the conditions of the certificate must be met, and there must be assurances that the turbines will have no negative impacts. The conditions under which the proposed turbines have been evaluated were based upon a worst-case scenario (the model with the greatest potential impact was evaluated), according to staff member Stuart Siegfried. If a different model were selected than the one proposed, any potential impact necessarily would be lessened. This is hardly a blank check for Buckeye.
{¶ 25} Furthermore, any choice of turbine model by Buckeye will be a matter of public record. As a board created within the Public Utilities Commission of Ohio, R.C. 4906.02, all facts and information in the board’s possession “shall be public, and all reports, records, files, books, accounts, papers, and memorandums of every nature in its possession shall be open to inspection by interested parties or their attorneys.” R.C. 4905.07.
*455 III. The Board’s Order Should Be Affirmed

A. The Board’s Order Followed Statutory Requirements

{¶ 26} The board has exclusive jurisdiction over construction of wind farms such as the one proposed by Buckeye. See R.C. 4906.13. Pursuant to R.C. 4906.12, this court must apply the same standard of review to power-siting determinations that it applies to orders of the Public Utilities Commission. Accord Chester Twp. v. Power Siting Comm., 49 Ohio St.2d 231, 238, 361 N.E.2d 436 (1977). “R.C. 4903.13 applies to board proceedings pursuant to R.C. 4906.12 and provides that an order ‘shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable.’ ” In re Application of Am. Transm. Sys., Inc., 125 Ohio St.3d 333, 2010-Ohio-1841, 928 N.E.2d 427, ¶ 17, quoting Constellation NewEnergy, Inc. v. Pub. Util. Comm., 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We have “ ‘complete and independent power of review as to all questions of law5 ” in appeals from the board. Ohio Consumers’ Counsel v. Pub. Util. Comm., 121 Ohio St.3d 362, 2009-Ohio-604, 904 N.E.2d 853, ¶ 13, quoting Ohio Edison Co. v. Pub. Util. Comm., 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997).
{¶ 27} In granting a certificate for the construction, operation, and maintenance of a major utility facility, the board must determine eight specific points. R.C. 4906.10(A).[1] And if the board conditions issuance of a certificate upon *456 modification of the location of the facility, it may add that condition. R.C. 4906.10(B).[2] In this matter, the board issued a detailed 101-page order on March 22, 2010, granting a certificate to Buckeye for the construction, operation, maintenance, and decommissioning of the proposed wind-powered electric generation facility as modified by 70 separate conditions.
{¶ 28} The neighbors maintain that the board’s imposition of six conditions — 8, 33, 40, 45, 46, and 49 — supports a conclusion that the board asked the staff to make its decisions, not enforce them. Condition 8 requires Buckeye to submit plans for staff review and acceptance. Condition 33 requires Buckeye to provide a calculation of “the maximum potential distance for a blade shear event.” Conditions 40, 45, and 46 relate to the approval of three turbine sites. And condition 49 requires specific identification of the turbine model to be used.
{¶ 29} If Buckeye provides further information to the board’s staff that would require an amendment of the certificate, the board is required to hold a hearing on the amendment:
*457 On an application for an amendment of a certificate, the board shall hold a hearing in the same manner as a hearing is held on an application for a certificate if the proposed change in the facility would result in any material increase in any environmental impact of the facility or a substantial change in the location of all or a portion of such facility * * *.
(Emphasis added.) R.C. 4906.07(B).
{¶ 30} But the board must retain authority to determine what is subject to hearing — surely not every issue (e.g., whether white or gray screws are used in the control room), as that would be unworkable. In this case, we conclude that the board reasonably drew the line regarding the issuance of the certificate and the imposition of its conditions.

B. Further Hearing Is Unnecessary

{¶ 31} The dissenters argue that this matter should be remanded for further hearing. It is difficult to understand what additional hearings might accomplish. All the issues were debated at length by the parties and witnesses at the evidentiary hearing. Buckeye must comply with the certificate and its conditions as imposed by the board. This certificate is based explicitly upon public information as set forth in the application and at the hearing. Furthermore, we emphasize that the board specifically recognized in its order that “in accordance with Section 4906.07, Revised Code, the Board is required to hold a hearing in the same manner as on the application, where the amendment of a certificate involves any material increase in any environmental impact or substantial change in the location of all or a portion of the facility.” Pub. Util. Comm. No. 08-666-EL-BGN, at 82. Contrary to the dissenters’ argument, the public was provided with a full opportunity for hearing, and further hearings may be held if significant changes are made to the certificate.
{¶ 32} The board’s order allows Buckeye to provide additional information on several issues as the construction process evolves. But Buckeye must construct its wind farm in accordance with the certificate issued by the board. R.C. 4906.98. Penalties may be assessed if Buckeye does not comply with the certificate. R.C. 4906.97. We now hold that the board acted within its authority in granting Buckeye’s certificate based on its 70 conditions. There is no need for delay.
{¶ 33} The neighbors’ first three propositions of law assert that the operational noise limits set by the board are either vague or unreasonable. To the contrary, the order sets discernible noise limits. That the standard is flexible poses no legal problem — an agency, particularly when facing new issues, may proceed on *458 an incremental, case-by-case basis. See Securities & Exchange Comm. v. Chenery Corp., 332 U.S. 194, 202-203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (an “agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule,” and thus “the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective”). As for the neighbors’ proposed standards, the testimony of Buckeye’s acoustic consultant showed that they were unrealistic and would effectively prohibit the development of wind energy in Ohio. Thus, the board properly rejected appellants’ proposals.
{¶ 34} The neighbors’ fourth proposition contends that the board-approved setbacks are not supported by the record, but ample evidence supports the order, and numerous conditions in the order will ensure their adequacy. The fifth proposition asserts that one of Buckeye’s witnesses lacked sufficient expert knowledge to testify regarding technical issues. The neighbors have not shown that he lacked expert knowledge or that they were prejudiced. Finally, in its sixth proposition, the neighbors assert that the board erred by disallowing the testimony of one of its witnesses. The witness was unable to attend the hearing, and the neighbors have not shown that the board erred in requiring his attendance.
{¶ 35} Finally, the political-subdivision appellants do not present any arguments that warrant reversal. The pertinent statutes do not require the county engineer to have final say over the amount of any road bond, and evidence introduced at the hearing supported the amount required for the decommissioning bond.
IV. Conclusion
{¶ 36} Pursuant to R.C. 4906.12, we must apply the same standard of review to determinations of the Power Siting Board as we do to orders of the Public Utilities Commission. Accord Chester Twp., 49 Ohio St.2d at 238, 361 N.E.2d 436. An order “shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable.” Constellation NewEnergy, Inc., 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50.
{¶ 37} The General Assembly has enacted statutes to require utilities to provide a portion of their electricity supply from alternative energy sources by 2025. R.C. 4928.64 and 4928.65. Our decision today does not give the board a free pass to avoid dealing with controversial or complex issues or to resolve issues without public participation or judicial review. To the contrary, the statutory process within R.C. Chapter 4906 is detailed and requires input of various stakeholders before a certificate is granted for construction of a new electric generation facility. In this case, the board has followed all statutes and *459 has based its determinations on the evidence in the record. The board’s decision is reasonable and lawful, and the order is therefore affirmed.
Order affirmed.
O’Connor, C.J., and McGee Brown, J., concur.
O’Donnell, J., concurs in judgment only.
Pfeifer, Lundberg Stratton, and Cupp, JJ., dissent.

. R.C. 4906.10 states:
(A) The power siting board shall render a decision upon the record either granting or denying the application as filed, or granting it upon such terms, conditions, or modifications of the construction, operation, or maintenance of the major utility facility as the board considers appropriate. The certificate shall be conditioned upon the facility being in compliance with standards and rules adopted under sections 1501.33,1501.34, and 4561.32 and Chapters 3704., 3734., and 6111. of the Revised Code. The period of initial operation under a certificate shall expire two years after the date on which electric power is first generated by the facility. During the period of initial operation, the facility shall be subject to the enforcement and monitoring powers of the director of environmental protection under Chapters 3704., 3734., and 6111. of the Revised Code and to the emergency provisions under those chapters. If a major utility facility constructed in accordance with the terms and conditions of its certificate is unable to operate in compliance with all applicable requirements of state laws, rules, and standards pertaining to air pollution, the facility may apply to the director of environmental protection for a conditional operating permit under division (G) of section 3704.03 of the Revised Code and the rules adopted thereunder. The operation of a major utility facility in compliance with a conditional operating permit is not in violation of its certificate. After the expiration of the period of initial operation of a major utility facility, the facility shall be under the jurisdiction of the environmental protection agency and shall comply with all laws, rules, and standards pertaining to air pollution, water pollution, and solid and hazardous waste disposal.
The board shall not grant a certificate for the construction, operation, and maintenance of a major utility facility, either as proposed or as modified by the board, unless it finds and determines all of the following:
*456 (1) The basis of the need for the facility if the facility is an electric transmission line or gas or natural gas transmission line;
(2) The nature of the probable environmental impact;
(3) That the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations;
(4) In the case of an electric transmission line or generating facility, that the facility is consistent with regional plans for expansion of the electric power grid of the electric systems serving this state and interconnected utility systems and that the facility will serve the interests of electric system economy and reliability;
(5) That the facility will comply with Chapters 3704., 3734., and 6111. of the Revised Code and all rules and standards adopted under those chapters and under sections 1501.33, 1501.34, and 4561.32 of the Revised Code. In determining whether the facility will comply with all rules and standards adopted under section 4561.32 of the Revised Code, the board shall consult with the office of aviation of the division of multi-modal planning and programs of the department of transportation under section 4561.341 of the Revised Code.
(6) That the facility will serve the public interest, convenience, and necessity;
(7) In addition to the provisions contained in divisions (A)(1) to (6) of this section and rules adopted under those divisions, what its impact will be on the viability as agricultural land of any land in an existing agricultural district established under Chapter 929. of the Revised Code that is located within the site and alternative site of the proposed major utility facility. Rules adopted to evaluate impact under division (A)(7) of this section shall not require the compilation, creation, submission, or production of any information, document, or other data pertaining to land not located within the site and alternative site.
(8) That the facility incorporates maximum feasible water conservation practices as determined by the board, considering available technology and the nature and economics of the various alternatives.

. R.C. 4906.10(B) states: “If the board determines that the location of all or a part of the proposed facility should be modified, it may condition its certificate upon that modification, provided that the municipal corporations and counties, and persons residing therein, affected by the modification shall have been given reasonable notice thereof.”