Kennedy, J.,
dissenting.
{¶ 58} Respectfully, I dissent. In affirming the decision of the Power Siting Board, the majority concludes that appellants failed to demonstrate that the “board’s decision was unreasonable or unlawful.” Majority opinion at ¶ 57. In my view, the board’s decision to grant the certificate was unreasonable and unlawful because the blade-throw setbacks that the board adopted and the default method to calculate background noise in a rural area that the board approved are unsupported by the record and are against the manifest weight of the evidence. Therefore, I would reverse the decision of the board and remand for further proceedings consistent with this opinion.
{¶ 59} As the majority correctly states, this court has affirmed prior board decisions granting certificates to wind farms. However, this case represents the first time we have considered setback limits since a turbine at an Ohio windfarm failed and threw a blade and is the first case in which a party opposing a certificate has offered expert opinions on the correct method to calculate background noise in a rural area.
I. Facts
{¶ 60} While I agree with the statement of facts set forth in the majority opinion, there are other important facts that should be considered.
A. Turbines under consideration
{¶ 61} On May 15, 2012, Champaign Wind filed an application to construct the proposed wind farm. The application originally asked the board to allow Cham-paign Wind to choose from among seven different proposed wind-turbine models. All of the turbines under consideration are manufactured to conform to international standards that are meant to prevent blade failures. All of the turbines also have the same safety systems, including independent braking systems, ice-detection software, and alarms that trigger an automatic shutdown. Moreover, in the opinion of the experts, all of the turbines under consideration are similar and share the same risk of malfunctioning due to blade shear, lightning, icing, and user error.
B. Danger of blade throws
{¶ 62} The certificate as approved by the board permits turbines to be built within 919 feet of nonparticipating property owners’ homes and 541 feet of their property lines. When these setbacks were approved, the board relied on the *507 minimum-setback calculation then set forth in R.C. 4906.20, which the board had also adopted as a rule under its rulemaking authority. Former R.C. 4906.20(B)(2), 2008 Am.Sub.H.B. No. 562; Ohio Adm.Code 4906-17-08(C)(l)(c)(i) and (ii).
{¶ 68} The minimum-setback standard was the same standard the board used when the Timber Road certificate was granted. After construction of the Timber Road facility, a Vestas V100 turbine at that facility malfunctioned. The blade-failure incident escalated when the operator, located in the state of Oregon, remotely restarted the wind turbine after the initial blade failure had caused the turbine to automatically shut down, which caused debris to be thrown across the landscape. According to an expert who testified before the board, operator error — like remotely restarting a damaged turbine — is the leading cause of wind-turbine failure even when computerized protection systems are in place.
{¶ 64} The board found credible the evidence that the blade failure at Timber Road caused the turbine to throw a piece of its blade weighing around six and one-half pounds a distance of 764 feet. After analyzing the circumstances of that incident, a safety expert testified that in his opinion, the six-and-one-half-pound piece of blade that was thrown 764 feet had the same force at impact as a 40-pound block of concrete falling from an eight-story building.
{¶ 65} After the blade-throw incident but while the application for this certificate was pending, Champaign Wind withdrew the Vestas V100 turbine from consideration for this project. Despite that withdrawal, the experts for Cham-paign Wind and the parties opposing the certificate agreed that the characteristics of the Vestas V100 turbine that threw the blade were not unique to that turbine.
C. Method used to calculate background noise
{¶ 66} The certificate as approved provides for a nighttime-noise-level design goal of 44 dBA. (As the majority notes, “dBA is a scale that attempts to measure the loudness of sound waves the human ear perceives as audible sound.” Majority opinion at ¶ 35). However, according to Raymond Strom, a board staff member, Champaign wind is not required to keep nighttime noise at or below that level. Despite the lack of a mandatory requirement, all the parties agreed that the World Health Organization (“WHO”) has “determined that a nighttime sound level of 40 dBA is the threshold at which sound goes from being relatively unnoticed to intrusive and annoying.” Acoustical engineers for Champaign Wind and for appellant Union Neighbors United (“UNU”) agreed that the maximum noise level that a nonparticipating land owner should experience is the preexisting background noise level plus five dBA.
*508 {¶ 67} There are multiple methods that can be used to calculate background noise, two of which are at issue in this case: the Leq method and the L90 method. The Leq method is the de facto state standard in Ohio because without any expert challenge to the method, it was used to evaluate the five previous wind-farm certificates approved by the board. However, all the acoustical engineers who testified in this case agreed that the Leq standard of measure is unsuitable for calculating background noise for wind-turbine farms located in rural areas.
{¶ 68} Champaign Wind’s acoustical engineer, David Hessler, testified that this was the first time in his 21 years of professional experience that he had used the Leq method to calculate background noise in a rural area. In his expert opinion, the Leq method is unsuitable for calculating background noise for wind-turbine farms in a rural area because it “is extremely sensitive to contaminating noise events.” Richard James, the acoustical expert hired by UNU, agreed, stating that the L90 method is the generally accepted metric to measure background noise around the United States and the world.
{¶ 69} Using the Leq method, Hessler measured the nighttime background noise at the site of the proposed wind farm as 39 dBA. Therefore, using the Leq method, the noise design goal for this facility would be 39 dBA plus 5 dBA, for a total intended nighttime noise level of 44 dBA.
{¶ 70} However, using the “appropriate” engineering method of L90, Hessler measured the nighttime background noise as 30 dBA. Therefore, using the L90 method, the noise design goal for this facility would be 30 dBA plus 5 dBA, for a total intended nighttime noise level of 35 dBA.
{¶ 71} Strom, the board’s staff member who supervised the noise portion of the board’s report, admitted that he is not an acoustical engineer — he is a botanist. He has never received any specialized training in acoustics and has never conducted a noise model. He testified that 16 of the 52 turbines that the board’s certificate allows Champaign Wind to construct are predicted to exceed the 44 dBA maximum. While the turbines can be operated in a low-noise-level mode, that is not a requirement of the certificate.
{¶ 72} Instead, the certificate requires Champaign Wind to implement a complaint-resolution process for residents affected by the wind farm. However, as Strom testified, the changing conditions of the atmosphere, like wind shear, atmospheric discontinuity, and temperature inversions, can lead to variations in the amount of noise people living' near the turbines hear at any given time. It is therefore possible that the environmental conditions that exist at the time a complaint is generated will be different from the environmental conditions at the time of any subsequent testing.
*509 {¶ 73} Contrary to the expert opinions of the acoustical engineers, the board continued to use the background-noise measurement based on the Leq standard, concluding that “UNU fails to provide any rationale for us to depart from past board precedent.”
II. Analysis
A. Standard of review
{¶ 74} I agree with the majority that appellants must overcome a high hurdle to demonstrate that the board acted unreasonably or unlawfully. “The appellant bears the burden of demonstrating that the commission’s decision is against the manifest weight of the evidence or is clearly unsupported by the record.” In re Application of Ohio Power Co., 140 Ohio St.3d 509, 2014-Ohio-4271, 20 N.E.3d 699, ¶ 14. While this court has been reluctant to overturn the decisions of the Public Utilities Commission or the board based on this standard, the standard the appellants must meet is not impossible to overcome.
{¶ 75} We have held that the commission acts unlawfully when its findings of fact are not supported by the record. See Ideal Transp. Co. v. Pub. Util. Comm., 42 Ohio St.2d 195, 196, 199, 326 N.E.2d 861 (1975). Moreover, “ ‘ “[a] legion of cases establish that the commission abuses its discretion if it renders an opinion on an issue without record support.” ’ ” (Brackets sic.) Indus. Energy Users-Ohio v. Pub. Util. Comm., 117 Ohio St.3d 486, 2008-Ohio-990, 885 N.E.2d 195, ¶ 30, quoting Tongren v. Pub. Util. Comm., 85 Ohio St.3d 87, 90, 706 N.E.2d 1255 (1999), quoting Cleveland Elec. Illum. Co. v. Pub. Util. Comm., 76 Ohio St.3d 163, 166, 666 N.E.2d 1372 (1996). We apply these same standards to decisions by the board. In re Application of Buckeye Wind, L.L.C., 131 Ohio St.3d 449, 2012-Ohio-878, 966 N.E.2d 869, ¶ 26.
B. R.C. Chapter 4.906 provides the mandatory criteria for issuance of a certificate
{¶ 76} The protection of property rights is of fundamental importance to our western tradition of law. See 6 The Writings of James Madison 101-103 (Hunt Ed.1906). Government is instituted to serve that end. Id. at 102. “The right of private property being, therefore, an original right, * * * [it is] one of the primary and most sacred objects of government to secure and protect * * Bank of Toledo v. Toledo, 1 Ohio St. 622, 632 (1853).
{¶ 77} The General Assembly enacted the statutory scheme in R.C. Chapter 4906 to balance the rights of property owners interested in engaging in the production of alternative wind energy against the rights of nonparticipating property owners to be free from the adverse environmental impacts of the participating property owners’ activities. See R.C. 4906.10. To that end, the *510 General Assembly created eight criteria in R.C. 4906.10(A)(1) through (8) and mandated that certificates “shall not” be granted unless all of them are met. Two of the eight criteria direct the board to determine the “nature of the probable environmental impact” and to ensure that “the facility represents the minimum adverse environmental impact.” (Emphasis added.) R.C. 4906.10(A)(2) and (3).
{¶ 78} The General Assembly did not define the term “environmental” for purposes of these requirements. See R.C. 4906.01 (setting forth definitions applicable for purposes of R.C. Chapter 4906). Because the term “environmental” has not acquired a technical or particular meaning by legislative definition or otherwise, the word should be given its usual and ordinary meaning. R.C. 1.42; Weaver v. Edwin Shaw Hosp., 104 Ohio St.3d 390, 2004-Ohio-6549, 819 N.E.2d 1079, ¶ 12. “Environmental” is the adjective form of the noun “environment,” which has been defined as “[t]he physical conditions of a particular place where a living person or thing exists.” Black’s Law Dictionary 651 (10th Ed.2014).
{¶ 79} The General Assembly gave the board rule-making authority to govern wind farms and statutorily established minimum setbacks to be incorporated into the rule, mandating that “[t]he setback shall apply in all cases except those * * * in which, in a particular case, the board determines that a setback greater than the minimum is necessary.” (Emphasis added.) R.C. 4906.20(B)(2)(a) and (c).
{¶ 80} While Champaign Wind’s application for a certificate was pending, the General Assembly enacted new statutory setbacks for wind farms that apply prospectively for all new or amended certificates. R.C. 4906.201, enacted in 2013 Am.Sub.H.B. No. 59 (effective Sept. 29, 2013) and amended in 2014 Am.Sub.H.B. No. 483 (effective Sept. 15, 2014). The new statutory setbacks are 1,125 feet from the nearest adjacent property line. R.C. 4906.20(B)(2)(a).
C. Proposed setbacks for blade throws are unlawful and unreasonable
{¶ 81} In 2012, we approved Buckeye Wind’s application for a wind farm with a setback of 541 feet from the property line. See Buckeye Wind, 131 Ohio St.3d 449, 2012-Ohio-878, 966 N.E.2d 869, at ¶ 5, 37. In part, we relied on the record in that case, which stated that the farthest a shorn blade could be thrown was 500 feet, even though that claim was based on data from a turbine that was smaller than the one approved in the certificate. Id. at ¶ 50. (Lundberg Stratton, J., dissenting). At the time of certification, no calculation existed for how far a blade might be thrown from the turbines under consideration. Id. And the board staff lacked “sufficient competence in physics even to attempt to calculate the distance a blade could fly.” Id.
{¶ 82} Today, we know that a wind turbine like the Vestas V100 can throw a shorn blade up to 764 feet and that the blade can have the same force on impact *511 as a 40-pound block of concrete falling from an eight-story building. The fact that Champaign Wind removed the Vestas V100 model turbine from consideration in this matter is of no consequence.
{¶ 83} Undisputedly, all of the turbines under consideration are similar. All of the turbines were manufactured to conform to international standards designed to prevent blade failures, and all of them employ the same safety features of independent braking, ice-detection software, and alarms that trigger an automatic shutdown. Therefore, all of the turbines should have the same risk of malfunctioning due to blade throw, lightning, icing, and user error.
{¶ 84} Human error is the leading cause of wind-turbine malfunction, and this danger will always be present. Moreover, like the Ohio facility at which the shorn blade traveled 764 feet after an operator located in Oregon remotely restarted the turbine after an automatic shutdown, the facility approved in this certificate will be capable of being operated from an undisclosed remote location.
{¶ 85} The General Assembly mandated the establishment of minimum setbacks that must be applied except in “particular case[s]” where “a setback greater than the minimum is necessary.” R.C. 4906.20(B)(c). The board found staff testimony that a shorn blade was thrown 764 feet from a Vestas V100 turbine to be credible. Even if blade throws are rare, the General Assembly has mandated that before the board exercises its authority to grant a certificate, it must make a determination of the “probable environmental impact” and must ensure that the facility will create “the minimum adverse environmental impact.” R.C. 4906.10(A)(2) and (3).
{¶ 86} It is undisputed that the remaining six turbine models approved in the certificate are similar to the Vestas V100 turbine in size, safety features, and capability for remote operation. Therefore, the probable environmental impact of a shorn blade thrown from one of the approved models includes debris flying up to 764 feet from the turbine. In this particular case, the “minimum adverse environmental impact” will likely be felt up to 764 feet from the property line. The supposed rarity of blade throws alone is not sufficient to overcome the statutory mandate.
{¶ 87} The General Assembly created a statutory minimum setback but acknowledged that in particular cases, “greater than the minimum” may be necessary. R.C. 4906.20(B)(2)(c). In this case, the board’s continued use of the minimum property-line setback of 541 feet fails to minimize the adverse effect that a blade throw can have on the property of a nonparticipating owner. Therefore, the setbacks approved in the certificate are unreasonable because they are against the manifest weight of the evidence. Adequate setbacks based on the actual evidence regarding blade throw are the only way to ensure that the facility complies with the law and has a “minimum adverse environmental impact.”
*512 D. Method used to measure background noise is unlawful and unreasonable
{¶ 88} In the five prior instances in which the board granted wind-farm certificates based on the use of the Leq standard to measure background noise in a rural area, the use of that method was not challenged and no expert acoustical-engineering testimony on the correct method was presented.
1. The acoustics experts agree: the proper method to measure background noise is L90
{¶ 89} The board’s reliance on the Leq method to determine preexisting background noise levels at the wind-farm site is unsupported by the record. UNU’s acoustical engineer, James, testified that Leq is not the appropriate method with which to calculate background noise in a rural area, because it provides an inflated background-noise measurement. Champaign Wind’s acoustical expert, Hessler, agreed. In Hessler’s 21 years of professional experience, this case was the first time that he had used the Leq method to calculate background noise in a rural area. In his expert opinion, the Leq standard is “unsuitable for wind turbine background surveys in rural areas” because it is “extremely sensitive to contaminating noise events.” He applied the Leq method here only because it was the method that had previously been used in Ohio and he believed it to be the “de facto State standard.”
{¶ 90} The majority correctly states that the method used to calculate background noise is not mandated by either statute or regulation and that the board has broad discretion absent a statutory or regulatory mandate. See Payphone Assn. v. Pub. Util. Comm., 109 Ohio St.3d 453, 2006-Ohio-2988, 849 N.E.2d 4, ¶ 25. However, the board’s continued use of an unsupported acoustical method to calculate background noise in a rural area in light of expert testimony that that method is unsuitable is unreasonable.
{¶ 91} This court has given deference to the board’s resolution of technical issues associated with approving certificates. See Office of Consumers’ Counsel v. Pub. Util. Comm., 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979). However, a prerequisite to this court’s reliance on an agency’s expert conclusions is that the agency has actual expertise in the area. See id. at 110 (this court will defer to an agency when based on its expertise, the agency is more competent to deal with a highly specialized area).
{¶ 92} In this case, however, Strom, the board’s staff member who was responsible for supervising and writing the noise section of the board report, is not an acoustical engineer, has no specialized formal training in acoustics, and has never conducted a noise model. His master’s degree is in botany.
{¶ 93} The board’s conclusion that the Leq method is reliable based on Strom’s testimony is against the manifest weight of the evidence, and the majority’s *513 deference to that conclusion is misplaced. All of the acoustical experts, including Hessler, testified that the Leq method was unsuitable to calculate background noise in a rural area. The only reason the Leq method was used in this certification process is that it was the standard that the board had previously used. The board, in issuing this certificate, has chosen to rely on the Leq metric notwithstanding the lack of agency expertise in acoustical engineering. Therefore, no deference should be afforded to the board’s conclusion.
{¶ 94} The board characterized the argument over using the Leq method or the L90 method as an argument over using a good method or a better method. This characterization ignores the fact that both of the expert acoustical engineers in this case testified that the Leq method is unsuitable for measuring background noise in a rural area and that the L90 method is the correct standard of measure. When the record fails to support the board’s conclusions, the decision of the board is unreasonable and the appellant’s burden has been met. See Monongahela Power Co. v. Pub. Util. Comm., 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29.
2. Continued use of the Leq method violates R.C. 4.906.10(A)(3)
{¶ 95} The parties’ experts agreed that the maximum amount by which the wind farm should increase the preexisting background noise level is 5 dBA. Therefore, the disagreement over which method should be used to calculate the background noise level in a rural area is fundamental to determining the “probable environmental impact” and to ensuring that a “minimum adverse environmental impact” occurs. See R.C. 4906.10(A)(2) and (3).
{¶ 96} Using the acoustically sound L90 method, the experts agree that the background noise level would be 30 dBA. Therefore, when the additional 5 dBA maximum increase is added, the true maximum noise level for the facility should be 35 dBA. Use of the unsuitable Leq method permits the facility to generate an additional 9 dBA, which raises the maximum noise-level threshold for the facility to 44 dBA at nonparticipating residences. But even this is not the maximum level of noise that the facility will emit.
{¶ 97} Strom, the board’s staff member, testified that the board knows that 16 of the 52 turbines approved in the certificate are predicted to generate a noise level that will exceed 44 dBA and that when those turbines operate for an undetermined “short period” at night exceeding the 44 dBA level, it will not violate the terms of the certificate. While the noise level can be reduced by operating the turbines in quiet mode, that is not a requirement of the certificate.
{¶ 98} The board recognized that “as both UNU and Champaign ackndwledge, WHO determined that a nighttime sound level of 40 dBA is the threshold at which sound goes from being relatively unnoticed to intrusive and annoying.” *514 Therefore, the negative environmental impact of continued use of the Leq method is not probable — it is certain. See R.C. 4906.10(A)(2).
{¶ 99} One of the criteria that the General Assembly requires for granting a wind-farm certificate is that the facility represents a “minimum adverse environmental impact.” R.C. 4906.10(A)(3). Granting a certificate, as the board did here, on the basis of an unsuitable method to calculate background noise in a rural area that permits the facility to emit a noise level that is known to exceed health limits, where the noise becomes “intrusive and annoying,” is not only unreasonable, it is unconscionable and unlawful.
{¶ 100} The manifest weight of the evidence demonstrates that the L90 metric is the correct method to calculate background noise in a rural area. The board’s decision to continue to use the Leq method to measure noise in a rural area is unlawful because it fails to comply with the General Assembly’s mandate that the facility have a “minimum adverse environmental impact” on nonparticipating residents. See R.C. 4906.10(A)(3).
3. A complaint process cannot cure the board’s failure to comply with R.C. 4-906.10(A)(3)
{¶ 101} Without an explanation as to why it was permitting the facility to operate at a noise level that is known to be adverse to human health, the board decided to require a complaint process. While it is within the sound discretion of the board to modify the terms of a certificate, in accordance with R.C. 4906.10(A), the addition of a new requirement cannot cure the issuance of a certificate that violates the “minimum adverse environmental impact” requirement contained in R.C. 4906.10(A)(3). The statutory scheme as enacted by the General Assembly does not grant the board authority to mitigate an adverse environmental impact, only to prevent it.
{¶ 102} The General Assembly requires the board to evaluate the probable environmental impact and to limit the negative effects of the facility prior to awarding a certificate. The board cannot remedy a known adverse environmental impact through a complaint process. The limitations on the complaint process employed by the board and the difficulty in administering that process demonstrate why the General Assembly requires that the facility represent a “minimum adverse environmental impact” prior to the certificate being issued.
{¶ 103} As Strom testified, he did not know whether the filing of a complaint means that further testing will occur. Even if testing were initiated after the filing of every complaint, environmental conditions that can affect the amount of noise residents hear may not be the same at the time that a test is administered, meaning that the test might appear to disprove what was in fact a legitimate noise complaint, thereby leaving nonparticipating property owners no apparent *515 recourse to address unhealthy noise levels that unreasonably infringe on their property rights.
Kevin S. Talebi, Champaign County Prosecuting Attorney, and Jane A. Napier, Assistant Prosecuting Attorney, for appellants Champaign County and Goshen, Union, and Urbana Townships.
Van Kley & Walker, L.L.C., Jack A. Van Kley, and Christopher A. Walker, for appellants Union Neighbors United, Robert McConnell, Diane McConnell, and Julia F. Johnson.
Michael DeWine, Attorney General, William L. Wright, Section Chief, and Werner L. Margard, Assistant Attorney General, and Sarah Bloom Anderson and Summer J. Koladin-Plantz, Assistant Attorneys General, for appellee Ohio Power Siting Board.
Vorys, Sater, Seymour & Pease, L.L.P., M. Howard Petricoff, Michael J. Settineri, and William A. Sieck, for intervening appellee, Champaign Wind, L.L.C.
Chad A. Endsley and Leah F. Curtis, urging affirmance for amici curiae Ohio Farm Bureau Federation and Champaign County Farm Bureau.
Howard Learner and Trent A. Dougherty, urging affirmance for amici curiae Environmental Law and Policy Center and Ohio Environmental Council.
III. Conclusion
{¶ 104} Respectfully, I dissent. In affirming the decision of the Power Siting Board, the majority concludes that appellants failed to demonstrate that the “board’s decision was unreasonable or unlawful.” Majority opinion at ¶ 57. In my view, the board’s decision to grant the certificate was unreasonable and unlawful because the blade-throw setbacks and the default method used to calculate background noise in a rural area are unsupported by the record and are against the manifest weight of the evidence. Therefore, I would reverse the decision of the board and remand for further proceedings consistent with this opinion.
Pfeifer, J., concurs in the foregoing opinion.